**STATE OF NORTH CAROLINA**

WAKE County

File No. 18CV000612

In The General Court Of Justice
☐ District ☒ Superior Court Division

# CIVIL SUMMONS

☐ **ALIAS AND PLURIES SUMMONS (ASSESS FEE)**

G.S. 1A-1, Rules 3 and 4

*Name Of Plaintiff*
NICHOLAS J. PILOS

*Address*
9105 Kettner Court

*City, State, Zip*
Raleigh NC 27615

**VERSUS**

*Name Of Defendant(s)*
BIOCLINICA, INC.

*Date Original Summons Issued*

*Date(s) Subsequent Summons(es) Issued*

**To Each Of The Defendant(s) Named Below:**

*Name And Address Of Defendant 1*
Bioclinica, Inc.
c/o Corporation Trust Company, Registered Agent
Corporation Trust Center 1209 Orange Street
Wilmington DE 19801

*Name And Address Of Defendant 2*

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and
2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

*Name And Address Of Plaintiff's Attorney (if none, Address Of Plaintiff)*
Robert A. Meynardie
Meynardie & Nanney, PLLC
2840 Plaza Place, Suite 360
Raleigh NC 27612

*Date Issued* 1-16-18 *Time* 4 ☐ AM ☒ PM

*Signature*

☒ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court*

☐ ENDORSEMENT (ASSESS FEE)
This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days.

*Date Of Endorsement* *Time* ☐ AM ☐ PM

*Signature*

☐ *Deputy CSC* ☐ *Assistant CSC* ☐ *Clerk Of Superior Court*

**NOTE TO PARTIES:** *Many counties have **MANDATORY ARBITRATION** programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)


© 2016 Administrative Office of the Courts

EXHIBIT A

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| *Date Served* | *Time Served* ☐ AM ☐ PM | *Name Of Defendant* |
|---|---|---|
| | | |

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

*Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| *Service Fee Paid*<br>$ | *Signature Of Deputy Sheriff Making Return* |
|---|---|
| *Date Received* | *Name Of Sheriff (type or print)* |
| *Date Of Return* | *County Of Sheriff* |

AOC-CV-100, Side Two, Rev. 6/16

© 2016 Administrative Office of the Courts

18CV000612

FILED
2018 JAN 15 P 4: 16
WAKE CO., C.S.C.

NORTH CAROLINA

WAKE COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION

NICHOLAS J. PILOS,

*Plaintiff,*

v.

BIOCLINICA, INC..

*Defendant.*

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff Nicholas J. Pilos ("Pilos"), by and through undersigned counsel, alleges and complains against Defendants as follows:

**PARTIES**

1. Pilos is a citizen and resident of Wake County, North Carolina.

2. Defendant Bioclinica, Inc. ("Bioclinica") is a Delaware corporation with its principal place of business at 2005 S. Easton Road, Suite 304, Doylestown, Pennsylvania 18901. Upon information and belief, Defendant is not registered to do business in North Carolina.

**JURSIDICTION AND VENUE**

3. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

4. Subject matter jurisdiction in this matter is proper in this Court pursuant to N.C. Gen. Stat. §§ 7A-240 and 7A-243 because this Court is a court of general jurisdiction, this is a justiciable matter civil in nature and of the kind where jurisdiction has not been placed elsewhere, and damages claimed are in excess of $25,000.00.

5. Personal jurisdiction in this matter is proper in this Court pursuant to N.C. Gen. Stat. § 1-75.4 because, *inter alia*, Pilos is a citizen and resident of North Carolina, and this action arises out of the actual performance of services in North Carolina.

6. Venue is proper in this Court pursuant to N.C. Gen. Stat. §§ 1-80 and 1-82 because Pilos is a resident of Wake County.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

7. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

8. Prior to being recruited by and accepting employment from Defendant, Pilos was employed by SAS Institute in the position of Senior Sales Manager.

9. In October of 2016, Defendant began recruiting Pilos to accept employment as a Global Vice President for Business Development.

10. Between October 2016 and January 2017, Steve Herne ("Herne"), Defendant's Chief Commercial Officer and Hiring Manager, represented to Pilos that Bioclinica's Financial Lifecycle Solutions division had a sales pipeline of between $57 and $60 million in the company's CRM application (Salesforce.com), which had progressed to the point where the Company assigned a 50% probability or greater of making these sales.

11. These representations were false.

12. Herne represented to Pilos that one particular $27 million deal was so close to completion that it would close in the 1st Quarter of 2017.

13. This representation was false.

14. Herne represented that there were significant commitments for a "Big Q1" of 2017.

15. This representation was false.

16. Pilos relied upon these representations in deciding to resign his position at SAS Institute.

17. Herne represented to Pilos that the sales cycle at Bioclinica required 3-6 months for small deals and 6-24+ months for larger deals.

18. In spite of this sales cycle, Defendant imposed a very large sales quota on Pilos for the First and Second Quarters of 2017, his first five (5) months of employment with Defendant.

19. Pilos accepted these sales quotas based upon the misrepresentations referenced above.

20. A significant portion of Pilos' expected compensation for 2017 was to have been commissions for the deals that Herne misrepresented were in the pipeline and misrepresented the progress made toward consummation.

21. In light of these misrepresentations and as partial compensation, Herne represented that Defendant would pay Pilos for Part II commissions on a very large deal that closed before his employment much as they were paying the Pilos for other such deals.

## COUNT 1
## BREACH OF CONTRACT

22. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

23. On or about January 6, 2017, Defendant offered Pilos employment as Global V.P. of Business Development. A true and accurate copy of the offer letter is attached hereto as Exhibit A.

24. Pilos accepted this offer on or about January 13, 2017 (hereinafter the accepted Offer is referred to as the "Agreement.").

25. The Agreement constituted a valid contract between Pilos and Defendant, supported by consideration.

26. Under the terms of the Agreement, Pilos was entitled to compensation as an employee and also eligible for commissions.

27. Upon termination for reasons other than "for cause" or "for performance" Defendant agreed to pay Pilos a severance equal to 13 biweekly payments of $7,115.39 ($92,500.07).

28. Pilos' employment was terminated for reasons other than cause or performance but Defendant has failed and refused to pay the severance benefit required by the Agreement.

29. Defendant's failure to make payments as agreed constitutes a breach of the Agreement.

30. Pilos has been damaged in an amount to be determined at trial as a direct and proximate result of Defendant's breach.

**COUNT 2**
**BREACH OF CONTRACT**

31. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

32. As part of the Agreement Defendant and Pilos agreed to a Compensation Plan for 2017 that included both base compensation and incentive compensation. The Compensation Plan was finalized and memorialized on or about March 30, 2017. A true and correct copy of the Compensation Plan (the "Plan") is attached hereto as Exhibit B.

33. In accordance with the Plan, Pilos was responsible for all Company accounts related to the Financial Life Cycle Solutions ("FLS") division.

34. Total commissions were earned and were to be paid in two stages, named Part I and Part II commissions. Both Part I and Part II commissions were to be paid within 45 days of the end of the quarter in which they were earned.

35. Part I commissions were to be paid on all FLS contracts won by Pilos' staff.

36. Part II commissions were to be paid on the invoices issued for products sold and/or services performed from each contract.

37. Pursuant to an agreement with PPD, PPD was to have paid Defendant in April, 2017. However, Bioclinica's CEO Dr. John Hubbard agreed to have the payment date moved to August 30, 2017.

38. Defendant had agreed to pay Part II commissions to Pilos for the PPD payment in the amount of $21,599.75.

39. Defendant has not paid Part II commissions on the PPD payment because he was terminated fifteen (15) days prior to the payment date.

40. Upon employment, Pilos began working to close a deal with AstraZeneca. Pilos, on behalf of Defendant, and AstraZeneca memorialized an agreement in a 100 page Master Services Agreement that included an annual licensing fee of $2.5 million.

41. On July 28, AstraZeneca communicated in writing its intent and commitment to purchase Defendant's solution pending AstraZeneca's budget approval process, which was represented to be in early September.

42. Part I and Part II Commissions on the AstraZeneca purchase would have been $90,900 if Pilos had not been wrongfully terminated by Defendant.

43. Upon information and belief, Pilos was terminated without cause in order to avoid the payment of earned and soon to be earned commissions.

44. The termination of Pilos' employment in order to avoid paying commissions on these sales was a breach of the contract and a breach of the implied covenant of good faith and fair dealing.

45. Pilos was damaged by these breaches in amounts to be determined at trial.

## COUNT 3
## FRAUD

46. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

47. Defendant, through its hiring manager, represented to Pilos that Defendant had between $57,000,000 and $60,000,000 in its sales pipeline in Salesforce.com that had progressed through the sales process to have equal to or greater than a 50% probability of successful closure.

48. Defendant specifically represented that a $27,000,000 deal with Johnson & Johnson would close in the First Quarter at first and then later said it would close in the Second Quarter of 2017.

49. Defendant provided this information with the intent that Pilos rely upon it in making a decision to resign his position with SAS Institute and accept employment with Defendant.

50. Pilos reasonably relied upon the information and representations of Defendant.

51. After accepting the position, Pilos discovered that the pipeline was far smaller than represented and that the Johnson & Johnson deal had little to no movement in the sales cycle towards a successful sale.

52. In fact, it was clear that there was virtually no potential for closing deals in the First or Second Quarter of 2017.

53. Defendant knew that the information it was providing Pilos was false.

54. Pilos was not permitted to investigate or verify the truth of Defendant's representations until after he had accepted employment due to the fact Defendant was replacing an existing executive with Pilos and they did not want his hiring to be public. Pilos was asked not to contact any of the FLS sales team due to this situation.

55. In reliance on the false representations of Defendant, Pilos resigned from a position he had held at SAS Institute for more than 13 years.

56. In reliance on the false representations of Defendant, Pilos accepted unrealistic sales quotas, which upon information and belief, Defendant has since used to justify termination of Pilos' employment.

57. Pilos reasonably relied upon the representations of Defendant and was damaged in the amount of lost income as a direct and proximate result of Defendant's misrepresentations.

**COUNT 4**
**NEGLIGENT MISREPRESENTATION**

58. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

59. In its recruitment of Pilos, Defendant provided him information that was false. Specifically, Defendant's representations regarding the sales pipeline and Pilos' earning capacity in light of that pipeline were false.

60. Defendant had a duty to exercise reasonable care to ensure that the information provided was accurate.

61. Defendant did not exercise reasonable care to ensure that the representations to Pilos were accurate.

62. Pilos reasonably relied upon the information, which was false, in making a decision to resign from SAS Institute and accept employment with Defendant.

63. Pilos was harmed by his reasonable reliance on the false information provided by Defendant in amounts to be determined at trial.

**COUNT 5**
**VIOLATION OF NORTH CAROLINA WAGE & HOUR ACT**

64. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

65. Under the terms of his employment, Pilos is entitled, upon termination, to $92,500.07.

66. Since his termination in August 2017, Defendant has failed to make payments as required.

67. Defendant's failure to make payment of wages as required under the terms of the employment agreement constitutes a violation of Article 2A of Chapter 95 of the North Carolina General Statutes.

68. Pilos is entitled to recover the amount of unpaid wages plus interest as well as liquidated damages and attorneys' fees as provided for in N.C. Gen. Stat. §95-22.2.

**COUNT 6**
**PUNITIVE DAMAGES**

69. Pilos incorporates the allegations in all previous paragraphs of its Complaint by reference as if fully alleged herein.

70. Pilos is entitled to recover exemplary or punitive damages as a direct result of Defendant's willful and intentional fraud in amounts to be determined at trial.

**PRAYER FOR RELIEF AND JURY TRIAL DEMAND**

WHEREFORE, Pilos respectfully requests the Court grant it the following relief:

1. That the Court enter judgment in Pilos favor and against Defendant on his claims and award, including interest, for the same in an amount to be proven at trial;

2. That the costs of this action, including a reasonable attorneys' fee if permitted by law, be taxed to Defendant and awarded to Pilos;

3. For a trial by jury on all issues so triable; and

4. For such other and further relief as the Court deems just and proper.

This 16th day of January, 2018.

**MEYNARDIE & NANNEY, PLLC**

By: ______________________

Robert A. Meynardie
NC Bar No. 20566
Robert W. Weston
N.C. Bar No. 48150
Crosspointe II
2840 Plaza Place, Suite 360
Raleigh, NC 27512
Ph: 919-747-7373
Fax: 919-324-6590
Email: bob@mnlaw-nc.com
Email: rweston@mnlaw-nc.com
*Attorneys for Plaintiff*

**VERIFICATION**

Plaintiff Nicholas J. Pilos, being first duly sworn, deposes and states that it is the Plaintiff in this action, that it has read the foregoing document, and that the matters and things alleged therein are true to its own knowledge and belief.

Nicholas J. Pilos

Nicholas J. Pilos

**STATE OF NORTH CAROLINA )**
**)**
**WAKE COUNTY )**

Sworn to and subscribed before me this the 12 day of January 2018 by

NICHOLAS J. PILOS

Notary Public, (Signature)

JESSICA F. HASKINS

(Name)

Stamp or Seal

JESSICA F. HASKINS
Notary Public
Wake Co., North Carolina
My Commission Expires July 22, 2019

My appointment expires: July 22, 2019



800 Adams Avenue
Audubon, PA 19403 USA
Phone +1-484-928-6000
Fax +1-484-928-6001
www.bioclinica.com

January 6, 2017

Nicholas J. Pilos
9105 Keltner Court
Raleigh, N.C. 27615

Dear Nicholas,

BioClinica, Inc. is pleased to confirm the decision to offer you the position of **Global VP, Business Development,** as a remote employee, reporting directly to Steve Herne, Chief Commercial Officer. Your employment will begin on **Monday, ~~January 23, 2017~~**. Please report in at 9AM on you first day.
January 30, 2017 NP

Please review the attached Terms and Conditions Sheet that details the offer and provides essential information about your employment with BioClinica, Inc. In addition, for your review and consideration are our Benefits summary and three agreements you will need to execute prior to the start of your employment: the Employee's Invention Assignment and Confidential Information Agreement, the Employee's Non-Competition Agreement, and the Insider Trading and Confidentiality of Information Policy.

**This offer is valid through January 13, 2017.** If you wish to accept our offer, kindly sign, date, and return the original offer letter to Human Resources in the enclosed self-addressed envelope by this date.

The remainder of the enclosed forms and agreements must also be completed and returned in the enclosed envelope prior to your official start with BioClinica, Inc. Please retain the second copy of the agreements and offer letter for your records.

- Employee's Invention Assignment and Confidential Information Agreement
- Employee's Non-Competition Agreement
- Insider Trading and Confidentiality of Information Policy
- Electronic Signature Policy

If you have any questions please contact me at 267-757-3336. We look forward to you joining BioClinica, Inc. where we think you can contribute a great deal.

Sincerely,
Kathleen Ketcha

Kathleen Ketcha
Director, Human Resources

EXHIBIT
A

Terms and Conditions

Compensation:

As compensation, you will be paid at a bi-weekly rate of $7, 115.39 as an exempt employee. You are also eligible to receive commissions as outlined in the 2017 eHealth Commission Plan document.

Management Equity Plan:

Subject to the terms and conditions set forth in the applicable plan and award agreement, as shall be determined by the Board, Employee shall be eligible to receive an award with target proceeds at or greater than $150,000.

Severance for Change in Control / Reduction-In-Force / Position Elimination:

Should the Company make the decision to terminate employment for reasons other than 1) "for cause", or 2) for performance within the first 12 months of employment, the employee is eligible to receive severance benefits equal to 13 biweekly payments of the employee's biweekly base salary in place at the time of termination. All severance is contingent upon adherence to restrictive covenants and executing the Company's release agreement. After completion of 12 months of service, this clause is no longer valid.

Work Schedule:

Normal business hours are 8:00 AM – 5:00 PM. Alternate work schedules are available at the discretion of your department Director/Manager. Alternate work schedule is defined as a block adjustment of no greater than one hour to the start and end time of our core business hours and/or a reduction in the meal/break time from one hour to one-half hour. Upon your date of hire, you will be required to select a scheduling option, with the approval of your department Director/Manager.

All terms of this offer are subject to the satisfactory completion of reference checks, pre-employment screenings and the execution of relevant documents including the "Employee's Invention Assignment and Confidential Information Agreement", "Employee's Non-Competition Agreement", & "Insider Trading and Confidentiality of Information Policy." You understand that the offer contained herein may be revoked by BioClinica, Inc. at any time, even after your acceptance. You further understand that this letter does not constitute an employment contract, or an offer to employ you for any particular length of time. If you accept this offer, both you and BioClinica, Inc. are free to terminate the employment relationship at any time for any reason.
This offer of employment is subject to the Immigration Reform and Control Act of 1986. All U.S. employees are responsible for completion and retention of Form I-9 for each individual they hire for employment in the United

States. On the form, the employer must verify the employment eligibility and identify documents presented by the employee and record the document information on the Form I-9. A list of acceptable documents can be found on the back of the Form I-9.

In consideration of employment, I agree to the terms and conditions set forth in this letter of employment dated January 7, 2017. This offer letter is not an employment contract. Employee is an "at-will" employee of BioClinica, Inc. and may be dismissed at any time for any reason or no reason.

Accepted this 13 day of January 2017

Signed: Nick Pilos

*Nicholas J. Pilos*

Social Security No.: 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

cc: Personnel File

BioClinica, Inc.
eHealth Solutions Business Development
FY 2017 Compensation Plan
Twelve months ending December 31, 2017

## I. OVERVIEW

The BioClinica, Inc. Sales Compensation Plan ("Plan") describes the incentive compensation paid to **Nick Pilos** ("Employee") while engaged in the selling of BioClinica, Inc's ("Company") products and services. The purpose of this compensation plan is to reward results and to foster an entrepreneurial spirit, i.e., the more successful I am, the higher the compensation. The Plan will have a total compensation made up of a base component and an incentive component driven by signed contracts. The VP, Business Development is evaluated every year and an individual plan is developed that takes into account a person's experience with the Company, the financial goals of the Company, certain Management objectives (e.g., new client goals), as well as the Employee's performance in the previous year.

**Your goal is to sign at least $30M in FLS contracts during the FY 2017.**

The following exclusions apply to all US territories. Please note that any exception to these exclusions must be documented and pre-approved by the President before contract signing.

- Renewal: Pfizer Impala Consulting & Operational Services, and Pfizer CSDS Commercialization

## II. PHILOSOPHY

The VP, Business Development will be responsible for all Company accounts related to the Financial Life Cycle Solutions (FLS) division. Total commissions will be earned and paid in two stages: Part I and Part II. Part I commission will be earned at the time of signing, while Part II commission will be earned during the course of the service billings from the contract. Part I and Part II commissions will be paid to the Employee within forty-five (45) days following the quarter it was earned. The aim is to continue to promote and foster an entrepreneurial spirit, but also a company team spirit. Repeat customers are critical to the long-term success of the Company and it is important to manage clients on an ongoing basis in order to achieve repeat business.

## III. TIME PERIOD IN EFFECT

The Plan is in effect from January 1 through December 31, 2017. It is subject to change by the President at any time with written notice. Changes will be applied as of the effective date of the change.

EXHIBIT
B

## IV. GENERAL TERMS AND CONDITIONS

1. Employment with BioClinica, Inc. may be terminated by the Employee or by BioClinica, Inc. at any time, pursuant to the terms outlined in the employee's employment agreement. The Company may, in its sole discretion, terminate, amend, supplement or supersede the terms of this Plan at any time upon written notice to the Employee. Changes will be applied as of the effective date of the change. Failure to satisfactorily accomplish the goals as time progresses may subject the Employee to probation or other disciplinary action, including possible termination. The Company further reserves the right, in its sole discretion, to accept or reject any order, to set and modify prices, to modify its product line and to manage and change it business in a manner which best serves the Company in the judgment of its management.

2. By signing this Plan, Employee recognizes and affirms their understanding and obligations to uphold the highest standards and strictest Confidentiality of all Company Confidential Information, including but not limited to, all Company Intellectual Property, copyrights, trademarks, Work Products, business processes, price calculators, customer engagements/partnerships, business plans, and financial information. Sharing or removal of Confidential Information from BioClinica premises, absent written consent permitting same for a legitimate business purpose in furtherance of BioClinica's interests, will be considered a violation of this term, and may result in legal action against Employee.

3. Nothing in the Plan shall be construed to create or imply the creation of a contract of employment between the Company and any participant in the Plan.

4. No participant may make unauthorized verbal or written commitments and/or otherwise alter BioClinica's standard contract.

5. No participant may share any part of this compensation with any person or customer.

6. Each participant shall submit required reports and documents as instructed by the Company.

7. Any question pertaining to the interpretation or administration of the Plan will be settled by the President, whose decision will be final and binding.

## V. CONFLICT OF INTEREST AND CODE OF CONDUCT

All participants of the Plan will abide by the policies and practices set forth in the BioClinica, Inc. Code of Business Conduct.

## VI. COMMISSION STRUCTURE

Commission rates apply to all BioClinica's products, consulting, training revenue, subscriptions, site maintenance, hosting maintenance and service charges. The Company may release new products in the future and modify commission rates associated with those products. No commission will be paid for hardware sales or out-of-pocket or pass through expenses billed to the client.

1. Reversal of Commissions for Returned Product or Cancelled Contracts

   See 7.a.v. below.

2. Further limitations on Payment of Commissions

   No Part I commission shall be paid for any eligible contract signing that occurs after the effective termination date of the Employee. No Part II commissions shall be paid for any eligible service or product billing that is billed after the effective termination date of the Employee. Amounts payable under this Plan are subject to verification and audit by the Company and its auditors. Notwithstanding any other term or condition in the Plan, the Company reserves the right to adjust, modify or reduce the commission payable under this Plan based upon unusual facts or circumstances as determined by the President, whose decision will be final and binding.

3. PAYMENT OF COMMISSIONS

The Vice President, Business Development will be paid Part I and Part II commissions on all eligible signed contracts won by his/her staff on FLS contracts as follows:

a. **PART I COMMISSION**
   i. Commissions are based on the actual net contract signings during the fiscal year being addressed.
   ii. Commissions are earned at the time of a fully executed contract. A fully executed contract is defined as a contract where both authorized parties have signed the contract. (No commissions will be earned for a letter of intent.) The date of a fully executed contract being the date both parties have signed the contract.
   iii. PERPETUAL SOFTWARE LICENSE SALES
      1. Perpetual software license sales include all contract line items that meet the definition of perpetual software licensing under General Accepted Accounting Principles (GAAP). It also includes first year maintenance fees associated with a new perpetual software license agreement. It does NOT include service line items sold in conjunction with perpetual software sales or renewal contracts for service maintenance (see Service Sales.)

2. Commissions for perpetual software license sales will be calculated as a percentage of bookings on Perpetual Software License Line Items in a fully executed contract at a rate of 2.5%. (There is no Part II commission on perpetual software license sales.)

iv. SERVICE SALES

1. Commissions for service sales will be calculated as a percentage of bookings on Service Line Items in a fully executed contract at a rate 1%.

v. No commission will be paid out for a verbal award or letter of intent

vi. Payment of commissions will be made within forty-five (45) days following the end of the fiscal quarter (3/31, 6/30, 9/30, 12/31) in which the commissions were earned. The commissions will be included as a part of the normal payroll checks.

vii. Repayment of commission

Cancellations:

1. The cancellation date is defined as the date when Bioclinica, Inc. receives written or verbal notice of cancellation from the client.
2. The commission cancellation rate used will be the Part I commission rate at the time the contract was signed.
3. If a contract cancels within the first 12 months (365 calendar days) of the signing of the contract, then the commission paid, on the cancelled (unbilled) portion only, will be repayable to the company. The 12 month period is a rolling 365 days calculated from the date of contract signing. The amount due back to the Company will be deducted from the commission otherwise payable.
    a. Example: A contract, originally signed in January 2017 totaling $500,000, is cancelled by the client in October 2017. This transaction results in canceling the remaining services contracted, but not yet performed which total $300,000 as of the cancellation date. In this scenario, the Part I Commission paid to the Employee on the $300,000 will be repayable to the Company.

**b. PART I COMMISSION ACCELERATOR**

i. An additional 0.50% Part I Accelerator Commission will be paid on net signings in excess of the FY signings target. For the purposes of applying this accelerator, net signings is defined as the sum of all contracts and contract addendums signed during the FY. The accelerator will be dependent on both exceeding the FY contract signings target and the

accomplishment of the management objectives established by the Chief Commercial Officer for the VP, Business Development. The determination of the achievement of the objectives shall be at the sole discretion of the Chief Commercial Officer.

ii. Payment of commissions will be made within forty-five (45) days following the end of the fiscal year (12/31) in which the commissions were earned.

**c. PART II COMMISSION – Service Contracts**

i. Part II commissions will be paid on the net invoices for products sold and/or services performed from each contract won by the individual sales person. Part II commission is designed to reward the Employee for non-refundable client billing; therefore, this will not include refundable billings including any advance deposits that are refundable upon cancellation of the agreement.

ii. Payment of commissions will be made within forty-five (45) days following the end of the fiscal quarter (3/31, 6/30, 9/30, 12/31) in which the commissions were earned. The commissions will be included as a part of the normal payroll checks.

iii. Part II commission will be paid at a rate of 0.30%.

**By signing below, the Employee acknowledges having received, read and understood the Plan and accepted its terms and conditions.**

DocuSigned by: Nick Pilos — 30-Mar-2017

**Nick Pilos** — **Date**
**Vice President, Business Development, FLS**

DocuSigned by: Steve Herne — 28-Mar-2017

**Steve Herne** — **Date**
**SVP & Chief Commercial Officer, eHealth Solutions**

DocuSigned by: Angelo Stortini — 28-Mar-2017

**Angelo Stortini** — **Date**
**SVP, Business Operations**